IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| MARCUS WEBSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:21cv641-MHT |
| | ) | (WO) |
| CITY OF MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| EARL STANLEY WARE JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:21cv659-MHT |
| | ) | (WO) |
| CITY OF MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| JEREMY D. HARRISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:22cv716-MHT |
| | ) | (WO) |
| CITY OF MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiffs Marcus Webster, Earl Stanley Ware, Jr., and Jeremy D. Harrison are African-American officers of the Montgomery Police Department (MPD).  In February 2021, each plaintiff was suspended for 20 days from MPD, demoted, and prohibited from accepting off-duty work for one year.  The plaintiffs each brought one of three separate lawsuits against the defendant, the city of Montgomery, Alabama, asserting racial discrimination and retaliation in violation of three federal statutes: Title VII (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a and 2000e through 2000e-17); § 1981 (the Civil Rights Act of 1991, 42 U.S.C § 1981); and § 1983 (the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983).[1]  Jurisdiction is

_____

1. In their complaints, Webster and Ware each accuse MPD of "unlawful employment practices ... and the creation of a hostile work environment."  Webster's Compl. (Doc. 1 (2:21-cv-641-MHT)) ¶ 10; Ware's Compl. (Doc. 1 (2:21-cv-659-MHT)) ¶ 10.  Neither plaintiff brings a standalone hostile-work-environment claim or

2

proper pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title

VII), 28 U.S.C. § 1331 (federal question), and 28

U.S.C. § 1343 (civil rights).

The city has filed a motion for summary judgment in

each case, arguing that the plaintiffs were disciplined

for violating MPD's off-duty employment policy and that

there was no consideration of race in the decision to

discipline them.[2]   During an on-the-record hearing on

---

contends that he experienced harassment. *See Fernandez
v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020)
(explaining that harassment is a critical element of a
hostile-work-environment claim).

2. The city also contends that Ware and Harrison's
complaints are untimely because they were filed more
than 90 days after the 'right to sue letters' first
became available on the Equal Employment Opportunity
Commission's online portal.   Although the counts in
each complaint refer only to Title VII, the plaintiffs
invoke §§ 1981 & 1983 in their statements of
jurisdiction.   Ware mentions both provisions in his
prayer for relief as well.   In the Eleventh Circuit
Court of Appeals, a claim made possible by the 1991
amendments to § 1981 has a four-year limitations
period. *See Baker v. Birmingham Bd. of Educ.*, 531 F.3d
1336, 1338-39 (11th Cir. 2008).   A standalone § 1983
claim has a two-year limitations period. *See id.* at

3

December 7, 2023, the parties agreed that the court should resolve the pending summary-judgment motions in each of the three lawsuits in a single opinion. For the reasons below, the court will grant the motions as to both the racial discrimination and retaliation claims.

---

1337. Under either statute, the plaintiffs' complaints would be timely.

However, a complaint "that commits the sin of not separating into a different count each cause of action or claim for relief" is an impermissible form of shotgun pleading. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1322-23 (11th Cir. 2015). Such may well be the case here, as the plaintiffs have failed to plead separate counts for each statute under which they seek relief.

In the interests of expediency and equity, the court will not ask the plaintiffs to amend their complaints or dismiss their claims on pleading grounds. For the reasons stated below, even if the court were to assume that the complaints are properly pled and timely under § 1981 and § 1983, the city would still be entitled to summary judgment. The court need not and does not reach the city's timeliness argument.

4

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine factual dispute exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "conclusory assertions," without admissible supporting evidence, "are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc). In general, summary judgment is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

5

## II. FACTUAL BACKGROUND

The facts, taken in the light most favorable to the non-movant, are as follows.

Webster, Ware, and Harrison--who, as stated, are African-Americans--joined MPD between 2006 and 2012. In addition to their regularly scheduled shifts, each plaintiff performed off-duty work.  As relevant here, MPD authorizes two types of off-duty positions: 'security officers' and 'courtesy officers.'

According to MPD policy as it is written today, security officers provide services to individuals and companies who hire them on an hourly basis.  An off-duty client might hire a security officer to stand guard at a store or an event.  Off-duty clients who hire security officers must pay an administrative fee to compensate the city for wear and tear to the officers' vehicles, uniforms, weapons, and other city-issued equipment.

6

Current MPD policy defines courtesy officers as off-duty employees who help maintain order in the apartment complexes where they live: checking lights, distributing notices, and generally being on call for the property's management.  Unlike security officers, who receive financial remuneration for their work, courtesy officers are compensated in-kind with free or discounted rent.  The city does not require their clients to pay an administrative fee.

At all times relevant to these lawsuits, no MPD policy explicitly required courtesy officers to live in the apartment complexes they served or prohibited them from accepting an hourly wage as payment instead of free or discounted rent.  To the extent MPD had a policy distinguishing between how courtesy and security officers were compensated, it was based on practice and tradition.

In 2014 and 2018, respectively, Harrison and Ware were approached by the manager of the Estates at

7

Northampton, an apartment complex providing 'Section 8 housing.'  The manager asked each of them to work as a courtesy officer on her property.  The officers accepted the position but made too much income to live in Section 8 housing.  They nonetheless identified themselves as courtesy officers at the Estates at Northampton to MPD's off-duty coordinator.  They earned $ 374.50 weekly for their work.

In 2019, Webster's friend and fellow MPD officer--Antavione Ferguson, who is also African-American--asked him for help doing security work in Woods RV Park.  Webster visited the property about once a week and made $ 30 per hour.

The same year, Webster and Ferguson started performing off-duty work at Eagle Landing Apartments, where Webster had previously served as a courtesy officer in exchange for free rent.  Webster told MPD's off-duty coordinator that he had resumed doing courtesy work there but did not move back onto the property.  As

8

in Woods RV Park, he made $ 30 per hour.

None of the property managers who hired the plaintiffs paid the city's administrative fee.

In September 2020, the manager at Woods RV Park contacted MPD to complain about crime levels in the area and mentioned employing off-duty officers. The complaint was forwarded to Jenny Reaves, who was then MPD's chief of operations. Not knowing about any off-duty officers working at Woods RV Park, Reaves conducted a preliminary inquiry and discovered that neither Webster nor Ferguson had obtained MPD's permission to perform off-duty security work there. *See* Ex. J (Doc. 34-10 (2:21-cv-641-MHT); Doc. 27-10 (2:21-cv-659-MHT); Doc. 24-10 (2:22-cv-716-MHT)) at 70.

Reaves and other MPD officials began reviewing the off-duty coordinator's records and discovered that certain officers had undertaken courtesy positions at multiple apartment complexes simultaneously. Unless these officers were maintaining more than one

9

residence, they were not living in at least some of the apartment complexes that hired them.

Within a few days, MPD released an updated off-duty employment policy that explicitly limited courtesy officers to in-kind compensation. MPD also requested that City Investigations, a branch of city government that investigates administrative policy violations, look further into whether any officers had violated the policy. Thirteen officers, 12 of whom were African-American, eventually came to the attention of City Investigations. Among these officers were Webster, Ware, Harrison, and Ferguson.

Before this review of off-duty work ended, MPD concluded an unrelated investigation into Ferguson for improperly using force during a chokehold. He was terminated. MPD leadership knew that Webster and Ware were friendly with Ferguson and that they disagreed with the decision to remove him from the force.

In December 2020, City Investigations charged

Webster, Ware, and Harrison with violating MPD's off-duty employment policy by presenting themselves as courtesy officers without living on the properties they served. The officers were charged under the old version of the policy, which had not stated outright that courtesy officers could accept in-kind payment only. According to City Investigations, the rules governing courtesy officers and their compensation may have been unwritten, but they were well-known and well-established throughout MPD. City Investigations determined that the plaintiffs were security officers masquerading as courtesy officers and that none of them had fulfilled the requirements to do security work on the properties in question, such as having the managers pay the city's administrative fee.[3] Webster was also

---

    3. Another requirement of note is that MPD officers may not perform more than 25 hours of off-duty work in any single week. Security work and overtime, but not courtesy work, count toward the 25-hour limit. City Investigations found that Ware regularly violated this policy between the time he spent at the Estates at

charged with failing to secure the necessary approvals to perform security work at Woods RV Park.

City Investigations noted that each officer profited from performing unauthorized off-duty work: Webster had made $ 43,560.00 from his work at Woods RV Park and Eagle Landing, Ware had made $ 52,055.50 from his work at the Estates at Northampton, and Harrison had made $ 51,306.50 from his work at the Estates at Northampton.

Based on these findings, Reaves recommended suspending the officers for 20 days, demoting them each by one rank, and prohibiting them from performing off-duty work for one year. Each plaintiff separately met with the chief of police to dispute the charges and recommendations. They then had an evidentiary hearing before the mayor's designee. Finally, they appeared

---

Northampton (which City Investigations classified as security work) and other businesses where he served as a security officer.

together in an evidentiary hearing before the Montgomery City-County Personnel Board. Reaves's recommendations were upheld at each juncture, and the officers were disciplined accordingly.

The three cases therefore involve seven decision-makers: MPD's chief of operations, the chief of police, the mayor, the mayor's designee in personnel disputes, and three members of the Montgomery City-County Personnel Board. Besides the chief of operations and one member of the personnel board, who are white women, all the decision-makers are African-American men.

In April and May 2021, the three officed filed complaints regarding their discipline with the Equal Employment Opportunity Commission, which subsequently issued each of them a right to sue letter. Ferguson also filed an EEOC complaint based on his termination.

## III. DISCUSSION

a. Disparate Treatment on Account of Race

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a). Section 1981 states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens ... ." 42 U.S.C. § 1981(a). Webster, Ware, and Harrison claim that MPD's decision to discipline them constituted racial discrimination under both statutes. They pursue their § 1981 claim under § 1983, which is the vehicle for bringing § 1981 claims against state actors. *See Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008).

The parties agree that the racial discrimination claims at issue are governed by the *McDonnell Douglas*

14

burden-shifting analysis.  *See McDonnell Douglas Corp.
v. Green*, 411 U.S. 792 (1973).  This framework applies
to "single-motive" Title VII claims based on
circumstantial evidence,[4] in which the employee alleges
"that bias was the true reason for the adverse action."
*Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235
(11th Cir. 2016).[5]

_____

4.  The Eleventh Circuit defines "circumstantial
evidence" as evidence that is suggestive of a
discriminatory intent.  *See Fernandez*, 961 F.3d at
1156.  Direct evidence refers only to remarks and
conduct that cannot be reasonably understood to
indicate anything other than an unlawful discriminatory
motive.  *See id.*

5.  The officers do not assert a "mixed-motive"
theory, under which an employee can hold an employer
liable for bias that "'was a motivating factor for' an
adverse employment action, 'even though other factors
also motivated' the action."  *Quigg*, 814 F.3d at 1235
(quoting 42 U.S.C. § 2000e-2(m)).  They instead argue
that MPD acted pretextually and that their discipline
lacked any legitimate basis.  Moreover, while Title VII
claims may be brought under either a single-motive or
mixed-motive theory, the plaintiffs' § 1981 claims "may
be pursued under the single-motive theory only."
*Phillips v. Legacy Cabinets*, No. 22-10057, ___ F.4th ___,
2023 WL 8519216, at *5 (11th Cir. Dec. 8, 2023).  In
this case, the same outcome would result under either

Under *McDonnell Douglas*, the employee "bears the initial burden of establishing a prima facie case of discrimination by showing [by a preponderance of the evidence] (1) that [h]e belongs to a protected class, (2) that [h]e was subjected to an adverse employment action, (3) that [h]e was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Lewis*, 918 F.3d at 1220-21 (quoting *Holifield*, 115 F.3d at 1561-62).

The burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse-employment action. If it provides such a reason, the employee must identify "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate

---

theory of causation because, for the reasons discussed below, the plaintiffs have not shown that the unfairness they complain of was at all attributable to racial bias.

16

reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

On an employer's motion for summary judgment, it is often beside the point for a district court to dwell on whether the employee has successfully established a prima-facie case. *See Paige v. Equity Grp. Eufaula Div., LLC*, No. 2:18-cv-737-MHT, 2021 WL 4227034, at *3 (M.D. Ala. Sept. 16, 2021) (Thompson, J.). After all, the burden at the first two stages of the *McDonnell Douglas* burden-shifting analysis is "light" for both the employee and the employer. *Id.* (quoting *Bailey-Potts v. Alabama Dep't of Pub. Safety*, No. 3:11-cv-495-MHT, 2012 WL 566820, at *3 (M.D. Ala. Feb. 21, 2012) (Thompson, J.)). What is more, once the employer presents evidence of a nondiscriminatory reason for the adverse-employment action, as the city

17

does here, "the presumption of discrimination created by the prima facie case 'simply drops out of the picture.'" *Tynes v. Fla. Dep't of Juv. Just.*, No. 21-13245, __ F.4th __, ___, 2023 WL 8593114, at *4 (11th Cir. Dec. 12, 2023) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

Accordingly, although the parties' briefing focuses primarily on whether the plaintiffs have identified a similarly situated white comparator under the *McDonnell Douglas* framework, the court will address its analysis to "the ultimate question in a discrimination case": "whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination." *Tynes*, ___ F.4th at __, 2023 WL 8593114, at *1.

The officers contend that they have raised a triable issue of material fact about whether MPD had a practice of factoring race into its disciplinary decisions. They claim that Reaves, in particular,

18

"initiat[ed] meritless investigations against them and recommend[ed] harsher discipline for African American officers." Webster's Compl. (Doc. 1 (2:21-cv-641-MHT)) ¶ 24; Ware's Compl. (Doc. 1 (2:21-cv-659-MHT)) ¶ 26; Harrison's Compl. (Doc. 1 (2:22-cv-716-MHT)) ¶ 32. In support, they point to three groups of white officers whom they assert benefitted from MPD's racial favoritism: two white officers who used an off-duty client's internet connection to watch adult content, four white officers who logged overtime hours they did not work,[6] and a white corporal who submitted paperwork late to serve as a courtesy officer. The plaintiffs insist that these officers received lighter sanctions for similar or more egregious misconduct--and that

_____

6. In his deposition, Webster recalls hearing a rumor after filing his complaint that an African-American officer committed overtime theft alongside the white officers. *See* Webster's Ex. A (Doc. 34-1 (2:21-cv-641-MHT)) at 108-09. For the purposes of resolving the motion for summary judgment, the court will assume that the allegations presented to Reaves mentioned only white officers.

19

Reaves failed to investigate the allegations of overtime theft altogether.

These representations are insufficient to survive summary judgment for three reasons.

First, insofar as the plaintiffs posit Reaves as the source of their discriminatory treatment, they forget that she only 'recommended' their discipline. The plaintiffs have not shown how any biases she may have held affected which officers were investigated or what sanctions were ultimately imposed. The closest they come is their theory that Reaves either directed the investigation or steered it toward particular officers. But, at oral argument, they could not point to any evidence indicating that City Investigations was beholden to Reaves's influence. *See* Rough Draft Hearing Tr. at 31. Nor have they alleged, much less shown, that any decision-maker who considered her recommendations acted out of racial prejudice. Without illustrating how any bias on Reaves's part tainted the

20

investigation that preceded her recommendations or the appeals that followed, the plaintiffs cannot survive summary judgment by casting aspersions on her motive.

Second, insofar as the plaintiffs contend that MPD (beyond just Reaves) made racially biased disciplinary decisions, most of their arguments rest on their impressions and speculations. They have submitted no evidence besides their own depositions to support their claims about all but one of the white officers mentioned in the complaint. The depositions are rife with ambiguity and based largely on hearsay: Webster, for example, had heard "from conversations" that the officers who watched inappropriate content "received like 20 days or somewhere around up in there." Webster's Ex. A (Doc. 34-1 (2:21-cv-641-MHT)) at 98. Absent admissible supporting evidence, no reasonable factfinder could credit the plaintiffs' claims about what misconduct these white officers committed or how MPD responded.

Third, MPD had compelling, nondiscriminatory reasons to discipline the only other white officer mentioned in the complaint more lightly than the plaintiffs. MPD permitted a white corporal to perform courtesy work on the property where he lived and on an adjacent apartment complex under common management. He received a written reprimand for not submitting the required paperwork to serve as a courtesy officer until four months after accepting the position.

The plaintiffs see MPD's willingness to let him do courtesy work on two properties and the decision not to suspend him as signs of racial bias. But they do not confront MPD's race-neutral justifications for treating the corporal differently: there is no allegation that he ever received financial remuneration from the apartment complexes, while the plaintiffs each made over $ 40,000 in unauthorized off-duty work; he lived on one of the properties where he was a courtesy officer; his misconduct spanned months, not years; and,

22

the complexes where he worked could plausibly be regarded as a single unit. MPD's decision to treat the corporal as differently situated to the plaintiffs is not surprising or suspicious given the race-neutral reasons for why it viewed him as committing a comparatively minor policy infraction. An employer does not offend Title VII by tailoring its discipline to the severity of the misconduct.

The plaintiffs have therefore failed to identify any white officers whom MPD disciplined more leniently based on race. What remains of their racial discrimination claim is the same argument they presented to the chief of police, the mayor's designee, and the personnel board: that their conduct complied with MPD's off-duty employment policy and that their discipline was, therefore, unfair. They emphasize that no MPD policy explicitly prohibited their conduct during the time in question, that they informed their supervisors and the off-duty coordinator that they were

living offsite, and that they performed off-duty work
for years without any indication that they were doing
anything improper.   If MPD had no sound basis to
discipline them, their logic goes, its decision to do
so must have been pretextual.

However, the Title VII inquiry turns on "'the
employer's beliefs' about the employee's conduct, 'not
the employee's beliefs'" about whether his actions were
permissible.   *Phillips v. Legacy Cabinets*, No. 22-
10057, ___ F.4th ___, 2023 WL 8519216, at *8 (11th Cir.
Dec. 8, 2023) (quoting *Alvarez v. Royal Atl. Devs.,
Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)).   MPD's
interpretation of its policy could well have been
faulty, but a faulty justification for an
adverse-employment action is not necessarily a
pretextual one.   After all, "employers are free to
[discipline] their employees for a good reason, a bad
reason, a reason based on erroneous facts, or for no
reason at all, as long as its action is not for a

discriminatory reason." *Flowers v. Troup Cnty. Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)).  To establish pretext, the plaintiffs must show that the decision to discipline them was not actually motivated by MPD's interpretation of its policy, however misguided that interpretation may have been.  This they have not done.

It is also noteworthy that the plaintiffs do not advance a 'cat's paw' theory, under which MPD could be liable for Reaves's bias had higher-level decision-makers accepted her recommendations uncritically.  *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 n.6 (11th Cir. 2013).  The plaintiffs have disclaimed making any argument to that effect.  *See* Rough Draft Hearing Tr. at 17-18.  In other words, they concede that there were three levels of decision-makers higher than Reaves who did not merely rubber stamp her recommendations: first, they met with the chief of

25

police; second, they had an evidentiary hearing before the mayor's designee, who then recommended that the mayor impose their discipline; and, third, the personnel board conducted yet another evidentiary hearing and performed a de novo review.

At each stage of their appeals, the plaintiffs challenged their discipline based on MPD policy and their notions of fairness. They do not question, and the record does not suggest, that the hearings they received were anything but full, fair, and independent. They have not claimed that they were treated unfairly during these hearings--and, again, the record does not indicate anything to the contrary--much less that they were treated unfairly based on race. Three levels of decision-makers considered their arguments that they were disciplined unfairly, and three levels of decision-makers sided against them. The plaintiffs may disagree with the outcome, but that alone cannot suffice to make out a racial discrimination claim under

Title VII.

Because the plaintiffs have not raised a triable issue of fact about whether MPD discriminated against them, the city is entitled to judgment as a matter of law on their disparate treatment claims.


b. Retaliation

Webster and Ware also argue that they faced retaliation from MPD in violation of Title VII. Each officer contends that MPD disciplined him because he disagreed with the decision to investigate and terminate Ferguson for the improper use of force.

Title VII prohibits employers from retaliating against an employee for "oppos[ing] any ... unlawful employment practice" or "participat[ing] in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). To make out a prima-facie case of illegal retaliation, an employee must show (1) that he "engaged in a statutorily protected activity," (2) that

27

he "experienced an adverse employment action," and
(3) causation. *Yelling v. St. Vincent's Health Sys.*,
82 F.4th 1329, 1337 (11th Cir. 2023).

As with racial discrimination claims, establishing
a prima-facia case of retaliation "is not onerous."
*Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1312
(11th Cir. 2016) (quoting *Texas Dep't of Cmty. Affs. v.
Burdine*, 450 U.S. 248, 253 (1981)). But even if the
court were to assume that Webster and Ware have made
out a prima-facie case, no reasonable factfinder could
conclude that MPD retaliated against them.

Webster and Ware concede that the thrust of their
retaliation claim is that they were "targeted [by MPD]
because they were friends with Ferguson." Rough Draft
Hearing Tr. at 37. But their association with Ferguson
does not constitute participation in a formal
employment proceeding or opposition to an unlawful
employment practice. Under some circumstances, a
retaliation claim is cognizable under Title VII even

28

when the employee did not himself engage in protected activity if he faced an adverse-employment action because he was closely associated with someone who did. *See Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1289-90 (11th Cir. 2021). Webster and Ware do not bring a third-party retaliation claim; each officer maintains that he faced retaliation for his own purportedly protected activity. In any event, a third-party retaliation claim would be an ill-fit on these facts, as no party contends that Ferguson's use of force was protected activity under Title VII.

Beyond offering his friendship, Ware does not claim that he ever expressed his solidarity with Ferguson to MPD. He did not speak with supervisory officials to protest Ferguson's firing or testify on his behalf. *See* Ware's Ex. A (Doc. 27-1 (2:21-cv-659-MHT)) at 92. Indeed, when asked whether he "actually t[ook] any action to support" Ferguson, Ware responded, "No." *Id.* MPD could not have retaliated against him for support

he never voiced.

Unlike Ware, Webster contends that he twice demonstrated his support for Ferguson.  First, he told the chief of police that Ferguson's termination was "wrong."  Webster's Ex. A (Doc. 34-1 (2:21-cv-641-MHT)) at 123.  But he did so only after Ferguson filed his EEOC complaint in April 2021, while the mayor had signed off on Webster's discipline two months earlier. *See id.* at 122-23.  Webster cannot claim that he was retaliated against for a conversation that occurred after his discipline had taken effect.

Second, during his deposition testimony, Webster briefly states that he "supported" Ferguson during his "hearing," *id.* at 91, but he does not explain what type of hearing this was, when it occurred, or how he made his support known.  He elsewhere disclaims ever testifying or submitting an affidavit on Ferguson's behalf. *See id.* at 123.  Webster's passing mention of a hearing whose purpose and date are unknown does not

create a triable issue of material fact.

The retaliation claims also fail because neither Webster nor Ware suggests that any decision-maker besides Reaves and the chief of police acted on a retaliatory motive. The plaintiffs had two evidentiary hearings before officials who, as discussed above, did not merely rubber-stamp Reaves's recommendations but acted independently. The plaintiffs have not shown that any of those officials knew that Webster had attended one of Ferguson's hearings or ever spoke with the chief of police. Nor is there evidence that those officials viewed Webster and Ware's friendship with Ferguson as material in any way to their respective determinations. At bottom, the plaintiffs' retaliation claims rest on factual allegations that were either unknown or scarcely mentioned to the higher-level decision-makers.

Accordingly, the court will grant the city's motion for summary judgment on Webster and Ware's retaliation

claims as well.

***

An appropriate judgment will be entered.

DONE, this the 27th day of December, 2023.

__/s/ Myron H. Thompson__
UNITED STATES DISTRICT JUDGE
